**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

RECEIVED
SDNY PRO SE OFFICE
2018 JAN -2  PM 1: 03

S.D. OF N.Y.

|  |  |  |
|---|---|---|
| GEMSHARES LLC, | ) | CASE No. 17-MISC-522(VB) |
|  | ) |  |
| Plaintiff, | ) | **FROM THE U.S. DISTRICT COURT** |
|  | ) | **FOR THE NORTHERN DISTRICT** |
| v. | ) | **OF ILLINOIS** |
|  | ) | CASE No. 1:17-cv-06221 |
| ARTHUR JOSEPH LIPTON and | ) | Hon. Matthew F. Kennelly |
| SECURED WORLDWIDE, LLC., a/k/a | ) |  |
| AMERICAN DIAMOND MINT LLC, | ) | Related to S.D.N.Y |
| Defendants, and | ) | 15-cv-1761(CM) & 17-cv-0844(CM) |
| Counterclaim Plaintiffs. | ) |  |

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1/2/18

**NON-PARTY CORMAC KINNEY'S PRO SE MOTION TO**

**QUASH SUBPOENAS TO PRODUCE DOCUMENTS**

TO THE HONORABLE JUDGE BRODERICK:

Arthur Joseph Lipton ("Mr. Lipton") and Secured Worldwide LLC ("Secured,")

collectively ("Defendants,") served upon non-party Cormac Kinney ("Mr. Kinney,") a Subpoena

to Produce Documents, (Ex. 1) from the U.S. District Court for the Northern District of Illinois

("N.D.I.L.")  Ten days later, on Dec 22, 2018, Gemshares LLC ("Gemshares") or ("Plaintiff")

served a similar Subpoena, also from the N.D.I.L. (Ex. 2), (together the "Subpoenas.")

Mr. Kinney is a resident of Manhattan. Defendants command that documents be delivered

to Epstein Becker & Green, at 250 Park Ave, in New York City. Plaintiff commands delivery to

Gibbons PC, One Penn Plaza, New York City. Each party is located in the Southern District.

Defendants' subpoena is defective on its face per Fed. R. Civ. P. 45(a)(1)(A)(ii), whereby

"Every subpoena must state the title of the action and its civil action number." Defendants'

subpoena erroneously commands Mr. Kinney to produce documents for another case pending in the N.D.I.L., No. 1:17-cv-06211, *Davis et al v. AbbVie, Inc. et al.*

The parties are completely diverse in citizenship, with Secured and Mr. Lipton in New York, and Gemshares in Illinois. Mr. Kinney and his documents are in New York, and the amount in controversy exceeds $75,000. Under the Erie doctrine, the Court must apply New York State Law where it creates substantive rights, or would change the outcome.

Accordingly, both Plaintiff and Defendants have failed to comply with New York CPLR 3101(a)(4), whereby a pre-subpoena motion is required to compel disclosure by a nonparty witness, stating the circumstances or reasons such disclosure is required, as well as CPLR 3101(d)(2), whereby materials may be obtained only upon showing a substantial need, and undue hardship to obtain the materials by other means. Mr. Kinney has a right to his state's protections. The litigants had a ethical reasons to comply, and only nefarious or negligent reasons not to.

Presuming that Defendants' subpoena was exclusively referring to the N.D.I.L. Action No. 1:17-cv-06221, *Gemshares v. Lipton et al*, it, along with Plaintiff's subpoena, must be quashed by this Court as required by Fed. R. Civ. P. 45(d)(3)(A)(iv) and Fed. R. Civ. P. 45(d)(3)(A)(i), and should be quashed as permitted by Fed. R. Civ. P. 45(d)(3)(B)(i).

## I.      The Subpoenas impose an extraordinarily undue burden on Mr. Kinney, and fail to allow reasonable time to comply.

Responding to the Subpoenas near limitless requests will be an extraordinarily disruptive and costly endeavor for Mr. Kinney, an inventor living paycheck to paycheck. Defendants' and Plaintiff's sweeping document requests, combined with equally expansive definitions, cover

virtually every document in Mr. Kinney's possession related to four years of his nearly full time research and development, plus two separate litigations stretching over three years.

The majority of the demands are for documents containing and detailing Mr. Kinney's trade secrets and confidential research and development. This volume of documents, emails and notes (over 20,000 pages) will require substantial time for patent attorneys to compile and review, and then take further action, deciding whether to deliver, redact, seal or object to each document. The exercise will require months of Mr. Kinney's active participation, when available.

But there is no substantial need for Mr. Kinney's trade secrets, nor any of his unique documents, as they are not relevant in Gemshares v. Lipton.  This is a simple breach of contract and patent infringement case, where Mr. Kinney is not a party. Gemshares is seeking to enforce its operating agreement with Mr. Lipton, a Gemshares member, in order to restrict his continued illicit pursuit of a "Gemstone Financial Product," and to enforce two Gemshares patents.

Chief Judge of the District Court for the Southern District of New York, Hon. Colleen McMahon ("Judge McMahon,") has already found as fact, in Case No. 15-cv-1761, that Mr. Lipton did exactly what Gemshares alleges: he intentionally breached their operating agreement and infringed their patents. Mr. Lipton's counterclaim is to attack the patent, and claim that Gemshares breached its promises to him, negating the operating agreement. (Exhibit 3) In a separate case (No. 17-cv-0844), Judge McMahon found that Mr. Kinney never entered any agreement with Gemshares to provide any services, nor developed anything for them whatsoever.

Mr. Kinney was never a member of either Gemshares or Secured, and was only briefly employed by Secured for two months, between December 2014 and February 2015. All of the material events in Gemshares v. Lipton predate Mr. Kinney's employment.

In reality, what is of interest to Defendants and Plaintiff, is that from 2013 to present, Mr. Kinney has independently developed trade secrets that could be extremely valuable to each of them. The actual claims, counterclaims and defenses in *Gemshares v. Lipton et al* have nothing to do with Mr. Kinney's trade secrets, documents, nor with Mr. Kinney whatsoever.

It is egregious that Defendants and Plaintiff are seeking to drag Mr. Kinney into their litigation. Mr. Kinney has already been victimized, defrauded and financially ruined by Mr. Lipton, an owner of both Gemshares and Secured.

Many of the documents demanded by the litigants are easily available from their opposing party. For example, Gemshares demands Mr. Kinney's communications with Secured, and Secured demands Mr. Kinney's communications with Gemshares. Gemshares demands all documents relating to Secured v. Kinney, which are available from Secured.  Secured even demanded publicly available court transcripts, along with all documents relating to Gemshares v. Kinney, which are easily available from Gemshares.

The defective Defendants' subpoena was received on December 11, 2017, demanding delivery by 9:30am January 5, 2018. The Plaintiff's subpoena was delivered December 22, 2017, demanding delivery by 9:30am January 17, 2018.

These dates are simply impossible, given the volume of documents, their complexity, and the need to protect Mr. Kinney's valuable trade secrets from direct competitors. If Mr. Kinney were ordered to produce the documents demanded in the subpoenas, he estimates that it will require 3 to 4 months and $160,000 to $220,000 in legal fees. His time is a considerable constraint. It will be impossible for him to pay these fees, or to take so much time away from his startup company, which employs ten people and requires his full attention as founder and CEO.

As a non-party, Mr. Kinney should not be forced to bear that cost. Mr. Kinney requests that any order to produce documents be contingent on Plaintiff and Defendants' reimbursing Mr. Kinney for all costs incurred and that each be required to advance $100,000 for the cost of his time, and for the retention of attorneys to review and log the documents at issue.

Fed. R. Civ. P. 45(d)(2)(B)(ii) requires a court to "protect [a non-party] from significant expense resulting from compliance." Such expenses include costs related to the retrieval, review, and production of documents as well as legal fees. Courts generally consider the following factors in deciding whether to award expenses to a non-party: "(1) whether the nonparty has an interest in the outcome of the case; (2) whether the nonparty can more readily bear the costs; and (3) whether the litigation is of public importance."

Mr. Kinney has no interest in the outcome of the case, and cannot possibly bear the costs.

**II.    To protect a person subject to a subpoena, the court for the district where compliance is required may quash the subpoena if it requires disclosing a trade secret or other confidential research, development, or commercial information.**

Both Defendants and Plaintiff are directly competitive to Mr. Kinney, and the information they each hope to obtain is crystal clear: they want to learn Mr. Kinney's valuable trade secrets. Both litigants outrageously demand disclosure of trade secrets developed by Mr. Kinney up to the present day, even after Mr. Lipton, simultaneously a member of Gemshares and the managing member of Secured, previously acquired Mr. Kinney's trade secrets through fraud in 2013-2014.

Judge McMahon ruled in Case No. 15-cv-1761, *Secured v. Kinney*, that Mr. Lipton fraudulently induced Mr. Kinney to disclose his trade secrets to Secured, fraudulently induced Mr. Kinney sign an LLC agreement with Secured, and fraudulently induced Mr. Kinney to assign patent rights (the "Kinney Patent") to Secured, all of which Judge McMahon reversed.

From the fruits of discovery, and Mr. Lipton's testimony, Judge McMahon learned that neither Mr. Lipton nor Secured could produce a single document, email or note detailing any trade secret, technique or invention that Mr. Lipton himself, or anyone other than Mr. Kinney, contributed to the Kinney Patent application, which is the essential basis for the Secured product. Judge McMahon found that "The Secured Worldwide patent application was predicated on Kinney's confidential information." Mr. Kinney has asserted, and maintains, that he alone invented everything novel or patentable in the Kinney Patent application.

Despite prevailing in litigation, Mr. Kinney made one irreversible error. Although Mr. Lipton contributed nothing tangible to the Kinney Patent claims, he listed his own name as an inventor. Believing Mr. Lipton's fraudulent inducement, and his lawyer, Mr. Kinney signed the sworn patent application, so Mr. Lipton remains listed as an inventor to this day.

Judge McMahon characterized Mr. Lipton's testimony as "utterly-" and "entirely incredible," his assertions as "manifestly not true," and summarized that "Lipton was lying when he testified." That Court ruling confirms that Mr. Lipton and Secured have no rights to Mr. Kinney's trade secrets or property, because Mr. Kinney was not a member of Secured, *ab initio*.

Judge McMahon also found that Mr. Lipton had knowingly violated the patent owned by Gemshares, and violated his operating agreement with Gemshares. As such, Mr. Lipton is barred from participating in any "Gemstone Financial Product," as defined in that agreement.

Despite Judge McMahon's ruling and findings, Mr. Lipton has pushed forward with impunity, continuing to directly violate his operating agreement with Gemshares. He transferred the intellectual property, ruled by Judge McMahon as infringing, and the use of the Kinney Patent, to a company in Singapore. Gemshares has finally decided to sue its member, Mr. Lipton.

In case No. 17-cv-0844, *Gemshares v. Kinney v. Lipton*, Judge McMahon ruled that there was never an agreement between Gemshares and Mr. Kinney to provide any services, or to develop any intellectual property for Gemshares. As such, Gemshares lost all rights to any intellectual property developed by Mr. Kinney.

Preposterously, in the present N.D.I.L. case, the relief Gemshares seeks is for the Court to award to Gemshares Mr. Lipton's interest in the Kinney Patent. The Kinney Patent is based on the very intellectual property "the eggs" that the Court lamented that it could not "unscramble." The Court returned to Mr. Kinney his patent rights, but could remove Mr. Kinney's trade secrets from Secured's product. The present discovery demands are Gemshares' blatant attempt to circumvent two court rulings.

Gemshares' goals are obvious. They seek to combine Mr. Kinney's trade secrets with Mr. Lipton's ill-gotten rights to the Kinney Patent. Mr. Kinney has taken steps to commercially exploit his trade secrets and the Kinney Patent. Therefore, Gemshares, Mr. Lipton and Secured are all current and direct competitors to Mr. Kinney.

In violation of Rule 45(d)(3)(B)(i), the disclosure to Defendants and Plaintiff, of any documents which are solely in the possession of Mr. Kinney, will surely result in the exposure of his confidential trade secrets, research and developments to competitive parties. And unless all future filings referring to Mr. Kinney's secrets are placed under seal, his valuable trade secrets will be disclosed to the public at large. As such, no modification of the Subpoenas would suffice.

The litigants might argue that Mr. Kinney does possess some relevant documents, without trade secrets. Perhaps, but all of those documents are readily available directly from the litigants.

In the course of defending 15-cv-1761, Mr. Kinney produced thousands of documents, emails and notes, marked as confidential, under the protection of a Stipulation and Confidentiality Order. (Exhibit 4) This Order required that Secured and Mr. Lipton return all of Mr. Kinney's confidential material upon the conclusion of the case, in December 2016. To date, one year later, Secured has not returned a single document.

Any documents that are not solely in the possession of Mr. Kinney, such as those from previous litigation, which are not subject to Judge McMahon's protective Order, can and should be obtained from the litigants directly. However, Mr. Kinney now fears that Gemshares has, or will obtain that confidential information from Secured. He is moving for an injunction.

Whether or not Mr. Lipton and Secured have improperly retained a copy of Mr. Kinney's confidential material, Mr. Lipton now seeks to be brought up to speed with Mr. Kinney's latest developments, which he did not have the opportunity to obtain by fraud previously.

> From Defendants' Subpoena:
> "Definition 18. Unless indicated otherwise, the time period covered in this subpoena is January 1, 2013 to the present."
> "Demand 9. All documents, communications and electronically stored information concerning Kinney's actual or potential development, design, or marketing of tamper-proof diamond packages on behalf of himself or any entity other than SWW, from January 1, 2015 to the present."
> "Demand 6. All documents, communications and electronically stored information concerning Kinney's actual or potential development of software for selecting and/or creating identifiable units consisting of multiple diamonds, or "baskets" of diamonds that have substantially equal monetary values."
> "Demand 7. All documents, communications and electronically stored information concerning Kinney's actual or potential development of software for diamond-based or gem-based financial instruments."

Gemshares also seeks exactly what its member Mr. Lipton took by fraud, and was returned by Judge McMahon.  Essentially every trade secret owned by Mr. Kinney.

> From Plaintiffs' Subpoena:
> "Definition 21. Unless indicated otherwise, the time period covered in this subpoena is <u>January 1, 2013 to the present</u>."
> "Demand 3. All documents referring or relating to the SWW Patent application.
> "Demand 4. All documents referring or relating to the VULT product."

## III.  A protective order will not sufficiently protect Mr. Kinney.

By accessing Mr. Kinney's documents, and viewing his schematics, the litigants will learn critical aspects of his designs and technology, in areas of great interest to them. Quoting Judge McMahon, "there is no way to unscramble the eggs." Mr. Kinney believes that the trade secrets are so sensitive, and the litigant's interest so strong, that even if marked attorney-only, critical aspects could inadvertently be disclosed to, or inferred by the principals, if not worse.

Mr. Kinney has no expectation that Mr. Lipton, or Secured, which he controls absolutely, would even honor a protective order. Mr. Lipton has blatantly committed fraud without pause, violated every agreement, and flouted Court findings. Judge McMahon labeled him as a liar, and he has already moved the tainted intellectual property, and his operations, offshore.

## IV.  Unclean hands. The Court must not ignore the fact that Mr. Lipton defrauded Mr. Kinney to obtain the very documents his companies now seek. Gemshares admits to having been aware of his ongoing fraud, and being the only party in position to notify Mr. Kinney. And yet Gemshares remained silent, and then vigorously denied any liability to compensate Mr. Kinney, for developing the very trade secrets Gemshares now demands to obtain through discovery.

In the interest of justice, Gemshares, Secured, and Mr. Lipton must not be given further opportunity to take advantage of Mr. Kinney, and to freely pilfer his life's work, again.

Returning to the violation of New York CPLR 3101(a)(4) and 3101(d)(2). For good reason, a pre-subpoena motion is required to compel testimony and disclosure of materials by a nonparty witness. Attorneys are required to state the circumstances or reasons such disclosure is required, and materials "may be obtained only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the case and is unable without undue hardship to obtain the substantial equivalent of the materials by other means." Counsel, all highly experienced members of the New York Bar, intentionally ignored the rule that would have throttled or exposed their clients' illicit ambition. This violation is especially egregious, and can only be interpreted as negligent or intentional. Sanctions must be imposed.

Both litigants' counsel are well aware of the history of fraud, litigation and the highly confidential nature of the documents they demand from Mr. Kinney.

Both litigants' counsel are well aware that Mr. Kinney has no legal training, and due to financial constraints, has had to defend himself Pro Se. And yet, neither party proposed a confidentiality agreement or protective order. It is unconscionable that counsel shirked their ethical and legal obligations to explain why Mr. Kinney was required as a witness, or why his confidential research and trade secrets are necessary to their cases. Counsel blatantly ignored the burden upon Mr. Kinney, or alternative sources for documents. Any court would certainly have scrutinized this extraordinarily broad and burdensome request, and inquired whether the desired evidence was available elsewhere. In truth, counsel would never have dared to present the Subpoenas they served upon Mr. Kinney, and that's the very intent of CPLR 3101.

For these experienced attorneys to break essential rules, and ignore their ethical obligations, can only be due to negligence in an inexcusable violation of Fed. R. Civ. P. Rule 45(d)(1), or worse, they willingly assisted their clients apparent goal to take from Mr. Kinney his valuable trade secrets, through deceit and subterfuge, in a stunning violation of Fed. R. Civ. P. Rule 11(b)(1).

## IV.    In Summary

For all of the foregoing reasons, which are summarized below, the Court should quash the Subpoenas in their entirety, and not consider any modification, even under protective order;

1.    The Court should quash the Defendants' subpoena because it is defective on its face

2.    The Court must quash the Subpoenas because

    a.    each litigants has failed to file a pre-subpoena motion to compel disclosure and materials from a nonparty witness, stating the circumstances or reasons such disclosure is required,

    b.    the Subpoenas fail to allow a reasonable time to comply,

    c.    the Subpoenas impose an extraordinarily undue burden, where the cost upon Mr. Kinney, in time and money, makes it impossible for him to comply, and

    d.    the Subpoenas impose an undue burden, because the documents demanded are overwhelmingly immaterial and irrelevant to the claims, or otherwise available.

3.    The Court should quash the Subpoenas because it would be impossible for Mr. Kinney to comply without disclosing his trade secrets, confidential research, and development to direct, duplicitous and highly aggressive competitors, if not to the public at large.

4.    The Court should quash the Subpoenas in the interest of justice.

THEREFORE, Cormac L. Kinney respectfully requests this Court to quash Defendants'

Subpoena to Produce Documents in a Civil Action dated December 10, 2017, and Plaintiff's

Subpoena to Produce Documents in a Civil Action dated December 20, 2017.

Mr. Kinney respectfully requests this Court to award him damages, jointly and severally from

Plaintiff and Defendants and their attorneys, to compensate Mr. Kinney for his time, admonish

the litigants for their behavior, and to dissuade them from such recklessness in the future;

a)   the amount of $7,500 from each side, to compensate him for the lost earnings, time and

   expense to research and prepare this motion, and

b)   the amount of $50,000 from each side, for the violations of NY CPLR 3101(a)(4) and NY

   CPLR 3101(d)(2), by intentionally failing to file pre-subpoena motions, and

c)   the amount of $50,000 from each side, for violating Fed R. Civ. P. 45(d)(1), by intentionally

   serving a subpoena without taking reasonable steps to avoid undue burden and expense, or

d)   the amount of $50,000 from each side, for violating Fed R. Civ. P. 11(b)(1), by intentionally

   serving a subpoena for an improper purpose,

e)   and/or such other amounts for each of the above, as deemed proper by the Court.

Dated: January 2, 2018                          Respectfully,

New York, NY

Cormac L. Kinney, *Pro Se*
845 United Nations Plaza
New York, NY 10017

# EXHIBIT 1

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
Northern District of Illinois

| | | |
|---|---|---|
| Gemshares LLC | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.   1:17-cv-06211 |
| Arthur Lipton and Secured Worldwide, LLC | ) | |
| | ) | |
| *Defendant* | ) | |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:            Cormac Kinney
845 U.N. Plaza, New York, NY 10017

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:            See attachment A

| Place: Epstein Becker & Green, P.C.<br>250 Park Ave.<br>New York, NY 10177 | Date and Time:<br><br>12/22/2017 10:00 am |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   12/01/2017

| | | |
|---|---|---|
| *CLERK OF COURT* | OR | *[signature]* |
| _____ | | _____ |
| Signature of Clerk or Deputy Clerk | | Attorney's signature |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   Arthur Lipton and Secured Worldwide, LLC (Defendants/Counterclaim Plaintiffs)            , who issues or requests this subpoena, are:

Kenneth Kelly, Esq., Epstein Becker & Green, P.C., 250 Park Ave., NY, NY 10177, 212-250-4500, kkelly@ebglaw.com

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.  1:17-cv-06211

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____  on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
**(i)** is a party or a party's officer; or
**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees— on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
**(i)** fails to allow a reasonable time to comply;
**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
**(iv)** subjects a person to undue burden.
**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
**(i)** expressly make the claim; and
**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## ATTACHMENT A TO SUBPOENA DUCES TECUM

## DEFINITIONS AND INSTRUCTIONS

1.  The term "GemShares" refers to plaintiff GemShares LLC and its affiliates, parents, subsidiaries, predecessors and successors, but individually and collectively as necessary to bring within the scope of the request any documents that may be otherwise construed as falling outside the scope of a request, as well as their respective members, officers, agents, partners, principals, shareholders, employees, consultants, attorneys, representatives and all other persons and entities acting on their behalf.

2.  The term "SWW" refers to defendant Secured Worldwide, LLC and its affiliates, parents, subsidiaries, predecessors and successors, but individually and collectively as necessary to bring within the scope of the request any documents that may be otherwise construed as falling outside the scope of a request, as well as their respective officers, agents, partners, principals, shareholders, employees, consultants, attorneys, representatives and all other persons and entities acting on their behalf.

3.  The term "Kinney" refers to Cormac L. Kinney, his agents, assigns, attorneys, representatives and all other persons acting on his behalf.

4.  The term "SWW patent application" refers U.S. patent application no. 14/619,633.

5.  The term "VULT" refers to the tamper-proof diamond packages marketed by SWW.

6.  The term "GemShares patent" refers to either or both of GemShares' U.S. patent nos. 8,239,211 and 8,706,513.

7.  The term "Kinney Action" refers to the action Secured Worldwide, LLC v. Kinney, Case No. 15-cv-1761 (CM), in the Southern District of New York.

8.  As used herein, the term "document" shall mean:  the originals (or copies when originals are not available), nonidentical copies (whether different from the originals because of notes made on such copies or otherwise) and drafts of any documents; agreements; contracts; communications, including (without limitation) correspondence; telegrams; cables; telexes; memoranda; records; books; charts; drawings; pamphlets; bulletins; ledgers; studies; plans; diagrams; summaries or records of personal conversations or interviews; invoices; diaries; appointment books; calendars; statistical statements; accountants' work papers; tables; indices; photographs; pictures; audio recordings; tapes; microfiche; videotapes; charges; accounts; analytical records; minutes or records of meetings or conferences; reports and/or summaries of interviews; electronically stored information, instant messages ("IMs"); e-mails (including Bloomberg and blackberry e-mails); computer records; reports and/or summaries of investigations; opinions or reports of consultants; appraisals; reports or summaries of negotiations; brochures; pamphlets; circulars; press releases; advertisements in any print or broadcast media; stenographic, handwritten or any other notes; projections; working papers; checks, front and back; check stubs or receipts; invoice vouchers; tape data sheets, data processing cards, disks or any other written, recorded, transcribed, punched, taped, filmed or graphic matter, however produced or reproduced; and any other document or writing of whatever description, including but not limited to any information contained in any computer and/or computer disk (including, without limitation, e-mail and instant messages), drafts and preliminary sketches.

9.  "Electronically stored information" means all electronic documents and any mechanical or digital records (including any associated meta-data) or representations of any kind (including electronic mail, computer files, tapes, cassettes, disks, recordings, and computer

2

programs and memories) from which information can be obtained or translated, whether stored in tangible, mechanical, or digital form or representation of any kind including (i) materials on or in computer tapes, disks, memory, mainframe computers, network servers, personal computers, hand-held devices or other magnetic, optical or other digital storage devices or media, and (ii) backup copies and "deleted" files on a computer or computer storage devices or media whether located on-site or off-site.

10. "And" as well as "or" shall be construed disjunctively or conjunctively as necessary to bring within the scope of a document request.

11. "Including" shall be construed to mean "without limitation."

12. "Concerning" means relating to, referring to, describing, evidencing or constituting.

13. "Any" shall also be construed to mean "all" and "all" also shall be construed to mean "any."

14. "Communication" means, without limitation, the transmission of a word, statement, fact, thing, idea, document (as defined above), instruction, demand, or question, including, but not limited to, meetings, discussions, conversations, telephone calls, voice mail, memoranda, e-mails, letters, telecopies, telexes, conferences, or seminars.

15. "Person" means any natural person or any business, legal, or governmental entity or association.

16. The singular shall include the plural and vice versa; the present shall include the past, present, and future; reference to any gender includes the other gender.

17. To the extent the following requests specifically demand electronically stored information and to the extent any document otherwise demanded contains electronically stored information, including meta-data, such electronically stored information should be

3

provided in its native format and this should include all meta-data and embedded information. Electronic stored information should not be converted from its' "original" native format.

18. Unless indicated otherwise, the time period covered in this subpoena is January 1, 2013 to the present.

### DOCUMENT REQUESTS

1. All documents, communications and electronically stored information concerning any actual or potential invention, technology, product and/or business activity of GemShares.

2. All communications between Kinney and GemShares from January 2, 2015 to the present.

3. All documents, communications and electronically stored information concerning Kinney's conception, development, design and/or contributions to any invention or technology described in the SWW patent application.

4. All documents, communications and electronically stored information concerning Kinney's conception, development, design and/or contributions to any invention or technology incorporated in the VULT product, including without limitation communications between (i) SWW or Kinney and (ii) third party vendors of hardware or software used for or in connection with the development of VULT products and software, or any other actual or potential SWW product.

5. All documents, communications and electronically stored information concerning Kinney's first conception of a tamper-proof diamond package.

6. All documents, communications and electronically stored information concerning Kinney's actual or potential development of software for selecting and/or creating

4

identifiable units consisting of multiple diamonds, or "baskets" of diamonds that have substantially equal monetary values.

7. All documents, communications and electronically stored information concerning Kinney's actual or potential development of software for diamond-based or gem-based financial instruments.

8. All documents, communications and electronically stored information concerning SWW's use of any diamond selection or valuation methods or processes described in the GemShares patents.

9. All documents, communications and electronically stored information concerning Kinney's actual or potential development, design, or marketing of tamper-proof diamond packages on behalf of himself or any entity other than SWW, from January 1, 2015 to the present.

10. All documents, communications and electronically stored information concerning Kinney's communications with counsel for GemShares, including without limitation, telephone or carrier company records reflecting all calls to and from GemShares attorneys after March 1, 2017.

11. All documents exchanged between the parties and all documents produced by Kinney and received by Kinney in the discovery phase of the Kinney Action, including without limitation all deposition transcripts (including in video formats) and all trial transcripts and exhibits, including transcripts and documents containing notes or annotations made by Kinney.

Firm:44649202v1

# EXHIBIT 2

AO 88B  (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the
### Northern District of Illinois

| | | |
|---|---|---|
| GEMSHARES LLC | ) | |
| _Plaintiff_ | ) | |
| v. | ) | Civil Action No.   1: 17-cv-06221 |
| ARTHUR JOSEPH LIPTON  and SECURED WORLDWIDE, LLC | ) | |
| | ) | (If the action is pending in another district, state where: |
| _Defendant_ | ) | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:  CORMAC KINNEY, 845 U.N. Plaza, New York, NY 10017

☑ _Production:_ **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material:

    See Attached Schedule A

| Place:  Gibbons, PC, One Penn Plaza, 37th Floor, New York, NY 10119 | Date and Time: 01/17/2018 9:30 am |
|---|---|

☐ _Inspection of Premises:_ **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date:  _12/18/2017_

_CLERK OF COURT_

                        OR

_____                    /s/ David De Lorenzi
_Signature of Clerk or Deputy Clerk_                    _Attorney's signature_

The name, address, e-mail, and telephone number of the attorney representing _(name of party)_     GEMSHARES LLC
_____, who issues or requests this subpoena, are:
David E. De Lorenzi, Gibbons, PC One Penn Plaza, 37th Floor, New York, NY 10119 ddelorenzi@gibbonslaw.com
212-613-2000

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.   1: 17-cv-06221

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

This subpoena for *(name of individual and title, if any)*    CORMAC KINNEY

was received by me on *(date)*                          .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $     0.00     .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), and (e) (Effective 12/1/07)

**(c) Protecting a Person Subject to a Subpoena.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*

**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

**(i)** At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.

**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

**(A)** *When Required.* On timely motion, the issuing court must quash or modify a subpoena that:

**(i)** fails to allow a reasonable time to comply;

**(ii)** requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any place within the state where the trial is held;

**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

**(iv)** subjects a person to undue burden.

**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:

**(i)** disclosing a trade secret or other confidential research, development, or commercial information;

**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or

**(iii)** a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial.

**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(d) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*

**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

**(i)** expressly make the claim; and

**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(e) Contempt.** The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

## SCHEDULE A

## DEFINITIONS AND INSTRUCTIONS

When used in this Subpoena, the following terms have the following meanings:

1.  "GemShares" means Plaintiff GemShares LLC, its officers, directors, representatives, employees, divisions, corporate parents, subsidiaries, affiliates, predecessors, or successors-in-interest, any joint venture to which it may be a party, consultant, agent and/or accountant, including any person(s) who served in any such capacity at any time.

2.  "SWW" means Defendant Secured Worldwide, LLC, its officers, directors, representatives, employees, divisions, corporate parents, subsidiaries, affiliates, predecessors, or successors-in-interest, any joint venture to which it may be a party, consultant, agent and/or accountant, including any person(s) who served in any such capacity at any time.

3.  "Lipton" means defendant Arthur Joseph Lipton, his agents, assigns, attorneys, representatives and all other persons acting on his behalf.

3.  "Defendants" means SWW and Lipton.

4.  "Action" means the lawsuit captioned in the subpoena to which this document is attached.

5.  "Document," and all forms thereof, means all tangible forms and electronic media in which information is stored and includes all written or graphic matter of every kind and description, however produced or reproduced, WHETHER DRAFT OR FINAL, original or reproduction, (including writings, drawings, graphs, charts, photographs, phonograph records, and other data compilations from which information can be obtained and translated, if necessary, by Plaintiff through electronic devices into reasonably usable form). It includes but is not limited to letters; emails; correspondence; memoranda; notes; transcripts; contracts; agreements; licenses; applications; memoranda of telephone conversations or personal conversations; minutes of meetings; interoffice communications; reports; financial statements; ledgers; books of account; proposals; prospectuses; offers; orders; receipts; working papers; desk calendars; appointment books; diaries; time sheets; logs; recordings or materials similar to any of the foregoing; however denominated; and including writing; drawings; graphs; photographs; charts; invoices; diaries; oral conversations; meetings; reports of telephone conversations; all video and audio recordings; microfilm; microfiche; computer discs, including floppy discs and hard drives; CD Rom; computer printout or tape; data processing results; printouts and computations, (both in existence and stored in memory components), and other compilations from which information can be obtained or translated, if necessary, through detective devices into reasonably usable form. The term "Document" also includes all copies of material containing any additional writing, underlining, notes, deletions, other markings or notations, or are otherwise not identical copies of the original whether actually or constructively possessed.

6.     "Communication" means any oral or written utterance, notation, depiction, or statement of any nature whatsoever or any other means of transfer or conveyance of information, including, but not limited to, correspondence, personal conversations, telephone calls, dialogues, discussions, interviews, meetings, consultations, telegrams, telexes, cables, memoranda, e-mails, agreements, and other verbal and non-verbal understandings.

7.     "Concerning" means comprising, recording, relating to, referring to, describing, evidencing or constituting.

8.     "Person" shall include, in addition to a natural person, any agent, employee, representative, attorney, superior, or principal thereof, or any business, legal or governmental entity or association.  It also means an individual, a partnership, corporation or other profit or non profit business association or entity or any governmental agency, department or unit.

9.     "Refers, reflects or relates to," when used in conjunction with or reference to a document or thing, includes the document or thing itself.

10.     The terms "including," "include," or "includes" mean that the following list contains illustrative examples of the types of documents responsive to the request, but the list is without limitation and does not constitute an exclusive or all encompassing listing of every type of document responsive to the request.

11.     "And" and "or" shall be construed conjunctively or disjunctively as necessary to make the discovery requests inclusive rather than exclusive. Use of a singular noun shall be construed to include the plural noun and use of a plural noun shall be construed to include the singular noun. The use of a verb in any tense shall be construed as the use of that verb in all other tenses whenever necessary to bring within the scope of the discovery request documents or information that might otherwise be construed to be outside its scope.

12.     "You" or "your" shall refer to the recipient of this subpoena and its subsidiaries, divisions, affiliates, officers, directors, employees or agents, including, but not limited to, attorneys and accountants.

13.     "Representative" means any officers, director, partner, joint entrepreneur, agent, employee, attorney, servant or any other person presently or formerly acting for or on behalf of the person referred to in any Document Request.

14.     The terms "relate to," "related to," and "relating to" mean, in whole or in part, constituting, containing, embodying, reflecting, describing, analyzing, identifying, mentioning, stating, referring directly to indirectly to, dealing with, or in any way pertaining to.

15.     "Kinney" means Cormac L. Kinney, his agents, assigns, attorneys, representatives, affiliates and all other persons acting on his behalf.

16.     The term "SWW patent application" shall refer to U.S. Patent Application No. 14/619,633.

17.     The term "VULT" shall refer to the tamper-proof diamond packages marketed by SWW.

17.     The term "the '211 patent" shall mean U.S. Patent No. 8,239,211.

18.     The term "the '513 patent" shall mean U.S. Patent No. 8,706,513.

19.     The term "GemShares patents" shall mean the '211 and '513 patent.

20.     The term "Kinney Action" refers to the action Secured Worldwide, LLC v. Kinney, Case No. 15-cv-1761 (CM), in the Southern District of New York.

21.     Unless indicated otherwise, the time period covered in this subpoena is at least January 1, 2013 to the present.

## **DOCUMENTS**

1. All documents referring or relating to GemShares.

2. All documents referring or relating to the GemShares patents.

3. All documents referring or relating to the SWW Patent application.

4. All documents referring or relating to the VULT product.

5. All correspondence between you and Defendants or their representatives.

6. All documents and information exchanged between yourself and Defendants or their representatives relating to the SWW Patent application or the VULT product.

7. All documents and information exchanged between yourself and Defendants or their representatives relating to GemShares or the GemShares patents.

8. All correspondence between yourself and GemShares or its representatives.

9. All documents and information exchanged between yourself and GemShares or its representatives relating to the SWW Patent application or the VULT product.

10. All documents and information exchanged between yourself and GemShares or its representatives relating to the GemShares patents.

11. All agreements entered between yourself and Defendants or their representatives.

12. All documents relating to the Kinney Action, excluding trial transcripts.

13. All documents produced in response to any subpoena served by Defendants on yourself.

# EXHIBIT 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————x

SECURED WORLDWIDE, LLC,

                   Plaintiff-Counterclaim Defendant,

    -against-

CORMAC L. KINNEY,

                   Defendant-Counterclaim Plaintiff.

———————————————————————x

CORMAC L. KINNEY,

              Third Party Plaintiff,

    -against-

ARTHUR JOSEPH LIPTON,

              Third Party Defendant.

———————————————————————x

| USDC SDNY |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: _12/15/16_ |

15 Civ. 1761 (CM)

McMahon, C.J.:

    The Court, for its findings of fact, conclusions of law, and verdict:

    ***Findings of Fact***

**Background Facts**

    1.    Secured Worldwide, LLC ("Secured Worldwide") is a Delaware limited liability company. Its founding and managing member is A. Joseph Lipton ("Lipton"). (Tr. at 42:3-4, 49:14.)

    2.    Secured Worldwide's consumer product, known by the trade name "Vult," consists of "a container and diamonds inside that form the product itself. . . . It is sort of the equivalent of a portable vault, hence the name. It is a way that someone can reliably buy diamonds in a relatively untrustworthy market. . . . It represents a method of transferring value

1

Copies mailed/faxed/handed to counsel on _12/15/16_

where authenticity can be confirmed." (Tr. at 42:15, 46:3-24.) Secured Worldwide was initially going to do business in Asia and intended to expand globally thereafter. (Tr. at 47:5-7.)

3.      The original Class A shareholders of Secured Worldwide were Lipton, Defendant-Counterclaim Plaintiff Cormac Kinney ("Kinney"), Joseph Plourde ("Plourde"), and Mark Lieberman ("Lieberman"). The original Class A shareholders signed an LLC Agreement on or about February 1, 2014. (PX-25.)

4.      Lipton originally held a 51% interest in Secured Worldwide; the other three shareholders each held a 12.25% interest. (PX-25 at Schedule I.) The remaining 12.25% interest in the Class A shares was eventually split among Eshed (no other name provided), Abhay Javeri, and Kenneth Sitomer, who invested $530,625, $15,312.50, and $15,312.50, respectively. These investments are memorialized in an Amended and Restated LLC Agreement, which was signed in or about July 2014. (PX-5 and Schedule I thereto.)

5.      Among other things, the Amended and Restated LLC Agreement caused the formation of the LLC (partnership) to date back to an effective date of November 20, 2013. (PX-5 at 1.)

**Kinney's Capital**

6.      Kinney was required by the terms of the LLC Agreement and the Amended and Restated LLC Agreement to make a capital contribution as provided in Schedule I to the Agreements. (PX-5 at 6; PX-25 at 6.) Schedule I provides that Kinney's capital contribution was to be $61,250. (PX-5 at 33; PX-25 at 34.) The term "Capital Contribution" is defined in the body of the agreement as "cash, property, services rendered, note or other binding unconditional obligation to contribute cash or property or perform services for the Company by each Member in his, her or its capacity as a Member *pursuant to the terms of this Agreement*." (PX-5 at 2; PX-25 at 2 (emphasis added).) However, the nature and amount of each party's capital contribution is set forth in Schedule I to the Agreements; Section 4.1 of both the original and Amended and Restated LLC Agreements provides that, "With respect to each Member, their respective . . . Capital Contributions are set forth opposite each of their respective names on *Schedule I* . . . . Upon execution of this Agreement, each Member shall contribute his, . . . her [or its] . . . Capital Contribution to the Company." (PX-5 and PX-25, Section 4.1 (emphasis added).) Schedule I to both the original and Amended and Restated LLC Agreements expressly provides that Kinney's capital contribution is to be made in cash – to wit, $61,250. Schedule I does not indicate that this obligation can be satisfied with anything other than cash. (*See* PX-5 at 33; PX-25 at 34; Tr. at 54:2-57:22.) Put otherwise, the terms of the LLC Agreement and the Amended and Restated LLC Agreement do not provide that Kinney's capital contribution could be made in any manner other than as set forth in Schedule I, and Schedule I says that Kinney was required to contribute cash in order to become a member of the LLC. (PX-5 at 33; PX-25 at 34.)

2

7.      While Kinney never put any cash into the venture, the other Class A members of Secured Worldwide treated Kinney as a partner and held him out to the world as a partner throughout their year and a half of association – even as they repeatedly deferred Kinney's obligation to make his capital contribution to the LLC. (*See* Tr. at 118:14-15, 119:2-9, 125:22-126:4; DX-43.) However, there is no credible evidence that the other Class A members agreed to excuse Kinney from making a capital contribution in cash. In PX-40, for example, Lipton demanded that Kinney write a check for his capital (a demand that would not have been necessary if Kinney had been permitted to contribute intellectual property in lieu of cash in exchange for his partnership share). Lipton offered to hold onto a check from Kinney for a while if Kinney was having difficulty paying – but the demand for cash was always there. (*See* PX-40; Tr. at 54:22-57:24, 371:21-374:20.) There is no evidence that, prior to this lawsuit, Kinney ever responded to this demand by protesting that he had already made his capital contribution. (*See* Tr. at 57:17-24, 371:21-374:20.)

8.      Kinney never made his capital contribution to Secured Worldwide. (Tr. at 53:25-54:1.)

**Secured Worldwide's Product and its Background**

9.      The product contemplated by Secured Worldwide consisted of a basket of diamonds encased in some sort of casing, which could be sold to investors. These Vults, as they came to be known, were to be created in multiple denominations, each of which would contain a "basket" of diamonds of roughly equal value (the Blue Vult would contain, say $5,000 worth of diamonds; the Yellow Vult would contain $10,000; the Red Vult would contain $25,000 – these are examples of the concept, not actual products created by Secured Worldwide). (Tr. at 42:9-11, 44:1-11, 44:18-21, 45:1-10, 45:15-19, 46:1-8.)

10.     Sometime during August 2013, Lipton introduced Kinney to Victor Feldman ("Feldman"), the managing partner of an LLC called GemShares, in which Lipton held a 10% interest. (*See* DX-2; DX-3; Tr. at 68:15-21, 134:7-14.) GemShares held a patent (U.S. Patent No. 8,239,211) on a "process to create a fungible global standard for diamonds and gemstones . . . [involving] grouping diamonds in an investment standard according to their gemological, proportional, optical and light behavior characteristics" – in essence, a process for sorting diamonds of various sizes, shapes, and quality into "baskets" of roughly equal value. (DX-1.) Although GemShares' patent contemplated the possibility of a commercial product, GemShares itself was interested primarily, if not exclusively, in creating a financial product that could be traded on exchanges – not a physical product that could be sold to consumers as an investment-type item (à la Krugerands). (Tr. at 419:9-19.) Lipton was interested in seeing GemShares develop a commercial product, which is why he introduced Kinney to Feldman. (*See* Tr. at 497:24-498:5, 537:23-538:10, 538:21-539:15; DX-19.)

11.     Kinney and GemShares discussed certain ideas ("the intellectual property") relating to a method for packaging equal baskets of diamonds – a sort of mini-"vault" – which

3

could then be traded on the financial markets or sold to the consuming public. (*See* Tr. at 134:15-138:14, 409:11-410:3.) Prior to holding discussions, they signed a Non-Disclosure Agreement (DX-3), which provided, *inter alia*, that Kinney's intellectual property would remain his property unless GemShares did a deal with Kinney, and vice versa.

12.     During their discussions, Kinney, through Lipton, proposed terms for an associational arrangement between him and GemShares. (DX-4.) Feldman, however, had no interest in Kinney's ideas – he did not believe that they contained anything new – and while Lipton forwarded Kinney's proposals to Feldman, GemShares did not enter into any arrangement with Kinney. (*See* Tr. at 361:9-18, 363:7-15.)

13.     Lipton continued to be interested in creating a commercial product along the lines of what Kinney had proposed to GemShares. During the fall of 2013, Lipton had been "silently working" on developing the contours of the business that would become Secured Worldwide. (DX-21.) He also had discussions with Feldman about structuring a joint venture of some sort between him and GemShares. But Feldman's proposal – essentially a suggestion that the existing company be "split" in two, and that Lipton "pay in capital" in the spun-off company "for a license fee" (DX-26) – was not acceptable to Lipton, who wanted to form "a completely independent licensed commercial product company under acceptable terms." (DX-26.) Lipton had already decided that he could not work with Feldman and his people; despite his being a limited partner in GemShares, his goal was to "walk away" from it in favor of his own independent enterprise. (DX-21.)

14.     Lipton wanted Kinney to come with him, and Kinney decided to cast his lot with Lipton's new venture in or about November or December 2013. (*See* Tr. at 416:19-21; DX-15; DX-21; PX-5.) At or about the time he decided to join Secured Worldwide, Kinney also quit his job with Newscorp. (Tr. at 64:5-7, 441:2-3, 442:8-9.) Kinney had been employed at Newscorp at an annual salary of $500,000 – although, by his own admission, things were not going well there, and he was being "screwed" by Rupert Murdoch. (Tr. at 189:19-190:6; PX-45.)

**Lipton and GemShares Cannot Agree on License Terms**

15.     On December 12, 2013, Lipton emailed Plourde and Lieberman a copy of a letter that Lipton had sent to the GemShares partners. (DX-26.) Lipton wrote: "Jay and Mark, You may recall that I expected Vic and Co to come back to me with a request for what I wanted after my rejection of their proposal. Yesterday afternoon Vic asked me to provide exactly that. *Please keep this between us three.* J." (DX-26 (emphasis added).) The email expressly stated that Lipton's proposed company would be a "licensed commercial product company." (DX-26.) The terms and overall tenor of DX-26 indicate that no deal had been put in place at the time it was written – which means that no such license was in place at the time the email was written.

16.     Apparently the recipients of Lipton's message about secrecy took it to heart, because no one told Kinney – their intended partner – that Secured Worldwide did not have a

license from GemShares, or that GemShares had taken the position that it needed such a license (a position with which Kinney would have agreed, see *infra*).

17.     After Lipton sent the email (DX-26) to two but not three of his proposed partners, the Class A shareholders entered into the LLC Agreement, on or about February 1, 2014. (PX-25.)

### The Patent Application and Assignment

18.     While the original LLC Agreement was being drafted (PX-25), a patent lawyer named Max Moskowitz ("Moskowitz") started preparing a provisional patent application. That application was eventually filed on or about February 12, 2014. (Tr. at 201:13-17; PX-14.) It claimed an invention for "SECURE DIAMOND SMART CARDS AND EXCHANGE SYSTEMS THEREFOR." (PX-14.)

19.     The patent application listed three co-inventors: Kinney, Lipton, and Plourde. (Tr. at 204:3-4; PX-14.) That said, the technology described in the patent application was essentially Kinney's brainchild – although the idea for the commercial product that Kinney's technology was supposed to bring to life came from Lipton. Plourde's contribution consisted of "creating . . . an ecosystem around the product itself" and helping to create the "aftermarket for the product." (Tr. at 378:11-379:23.)

20.     Originally, the inventors were to be Kinney and Lipton alone; Plourde actually did not want to be listed as an inventor. (*See* DX-34.) Through due diligence interviews, Moskowitz assessed the contributions of the various partners in Secured Worldwide and decided which members should (and should not) be listed as inventors. No one other than Moskowitz made this decision. (Tr. at 200:13-210:15.)

21.     Each of the listed inventors (including Kinney) was asked to, and did, assign all of his rights, title, and interest in the invention described in the patent application to Secured Worldwide. (PX-16.)

22.     The assignment was signed more or less at the same time as the original LLC Agreement and was part and parcel of putting together the Secured Worldwide operation. (PX-16; PX-25; Tr. at 211:22-213:8.)

### Kinney's Employment Proposals

23.     From the time he left his job at Newscorp, Kinney worked for Secured Worldwide. He did not obtain other employment. That was his own decision; no one prevented Kinney from obtaining other employment. (*See* Tr. at 64:8-10.) Kinney set up a lab (at Secured Worldwide's expense) to experiment with resins for the "puck" that was to hold the "basket" of diamonds. (*See* Tr. at 444:1-9.) Kinney also created specifications and prototypes for computer

Case 1:15-cv-01761-CM   Document 119   Filed 12/15/16   Page 6 of 25

programs that would create sets of diamonds.  He took those programs and delivered them to Industrial Algorithms, who rewrote them in "a[n] industrial program," which was subsequently copyrighted.  (Tr. at 415:14-416:13; PX-3; PX-27.)

24.     Throughout the year or so when his only work was for Secured Worldwide, Kinney repeatedly demanded money to compensate him for what he perceived as his value to the LLC.  Lipton repeatedly resisted those demands.  (*See* Tr. at 444:10-21.)

25.     In November 2013, which was before he left Newscorp, Kinney wrote to Lipton that he would "dedicate a full weekday every week to the projects."  (DX-16.)  In that email, Kinney directed Lipton to "[l]et [him] know if [he had] thought about the structure," referring to what Kinney believed to be the structure of the equity that Lipton had promised him.  (DX-16; Tr. at 426:4-11.)  Kinney believed that he "had separately agreed to work for additional sweat equity based on [his] market value" (Tr. at 426:21-23) and also believed that he and Lipton had "agreed to work out the details later."  (Tr. at 425:25.)  Lipton never responded to this proposal and Kinney's belief was just that – a belief, not a contract.

26.     Kinney testified that, in February 2014, Lipton "proposed to pay [Kinney] a mix of stock and cash with the cash after he raised more money . . . .  This was the final part of the sweat equity agreement [the two] had made in November [2013], *but [they] hadn't finalized the details which was [Kinney's] market rate.*"  (Tr. at 441:10-14 (emphasis added).)  Obviously, Kinney's "market rate" was a material contract term that could not be left to later agreement.  Lipton also allegedly "promised that whenever [Kinney] was working for less than $650,000 in cash, [he] would be earning stock."  (Tr. at 441:19-22.)  In fact, the only thing that really happened in February 2014 is that Kinney signed the LLC Agreement, which assigned him a fixed share in the new venture; obligated him to contribute capital thereto; and forbade him from entering into any sort of employment arrangement with Secured Worldwide without Board approval.  (PX-25 and PX-5, Section 6.12.)

27.     From the outset, Kinney and Lipton were at cross purposes about Kinney's participation in Secured Worldwide.  Lipton's vision was that of a start-up investor: he planned to raise capital from outside investors, manufacture and promote his product, and achieve his return from the increase in the value of his investment, not from a salary.  (*See* Tr. at 95:16-21, 268:15-269:4, 369:17-370:10, 370:15-25, 483:3-6.)  There is no credible evidence that Lipton ever agreed to the terms outlined in Paragraph 26; there is no writing signed by the party to be charged obligating Secured Worldwide to employ Kinney on the terms he proposed, and there is no evidence that Secured Worldwide ever paid Kinney a dime under this proposed arrangement.  To the extent that Kinney testified that Lipton agreed orally to this proposal, I do not credit his testimony.

28.     Kinney's testimony that his continuing to work was evidence that Lipton had, in fact, agreed to his proposal that he earn cash or additional "sweat equity" stock in Secured Worldwide is not persuasive.  (*See* Tr. at 442:8-13, 444:10-21.)  Kinney's principal failing as a

businessman is his tendency to assume that people agree with him even when they do nothing to manifest assent to his proposals. Silence, in business dealings, is not consent. *See Metro. Enters. N.Y. v. Khan Enter. Constr., Inc.*, 1 N.Y.S.3d 328, 329 (2d Dep't 2015) ("To create a binding contract, there must be a meeting of the minds as to the material terms of the agreement. Stated differently, 'there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms.'"); *Diarassouba v. Urban*, 892 N.Y.S.2d 410, 415 (2d Dep't 2009) ("In order to produce a legal contract, there must be an actual acceptance. Such acceptance must be clear and unequivocal and thus, cannot be ambiguous, as was the alleged assent involved here. As such, a silence which breeds ambiguity cannot constitute acceptance."). Lipton was "working" for Secured Worldwide without compensation in the hope that his investment of time and money would someday pay off – the classic entrepreneur. Since Kinney continued to work for Secured Worldwide without obtaining any firm commitment for interim compensation or a further equity stake in the business, Lipton had every reason to assume that Kinney was doing the same – even if that was not Kinney's preference. (*See* Tr. at 58:17-21, 59:17-19, 60:12-16, 370:4-10.) Lipton's testimony that he did not do anything to prevent Kinney from obtaining remunerative employment is credible; his acceptance of Kinney's services on a non-remunerative basis is consistent with their joint status as partners in a start-up. (*See* Tr. at 64:8-10.)

29.     Lipton's decision simply to ignore Kinney's demand also made sense in light of the fact that Section 6.12(c) of the LLC Agreement precluded the members (including Kinney) from being employed by the company except in limited circumstances: "The *Board* may choose to cause the Company to employ Members or Managers as employees of the Company, in exchange for such compensation *as shall be agreed between the Board and such other Member or Manager*. Such employment shall be at an at-will employment unless the parties agree otherwise." (PX-25 at 16 (emphasis added).) Kinney's proposal for an employment contract was never submitted to the members for a vote. While it is true that Lipton alone could have passed the measure with his 51% interest, the fact that he did not submit the proposal for Board consideration or place any indication of the purported agreement on the corporate record is further evidence that Kinney's proposal was never accepted. (*See* Tr. at 343:12-21.)[1]

**Kinney Learns that GemShares Has Not Licensed Secured Worldwide**

30.     Secured Worldwide hoped to roll out the first iteration of its commercial product in or about the third quarter of 2014. (*See* DX-19.)

31.     As noted above, GemShares had not given Lipton permission to create a commercial product using its patented algorithm to create "baskets" of diamonds of roughly equal value. However, at or about the time he decided to join Secured Worldwide, Kinney saw two documents that caused him to believe that Secured Worldwide had GemShares' permission

---

[1] Section 6.12(c) remains relevant, despite the fact that the Court is ordering rescission of the LLC Agreement, because it goes to Lipton's state of mind at the time the "employment contract" was allegedly formed.

7

to pursue the creation of a commercial product consisting of "vaults" of diamonds of roughly equal value.

32.     The first, DX-9, is an email from Lipton to Kinney discussing the launch by "NewCo, a licensee of GemShares" of a "new three-stone GIGS Diamond Basket directly to consumers." It is perfectly obvious that the "NewCo" referred to in the email became Secured Worldwide, and Lipton's testimony to the contrary is utterly and entirely incredible. (*See* Tr. at 142:21-144:15.) In this email, Lipton specifically advised Kinney that Secured Worldwide would be using the "GemShares patented process for fungibility" to create its commercial product, and stated that NewCo would be "the licensed commercial product company." (DX-9.)

33.     The second, DX-19, is a draft press release from "Secure$^D$ Worldwide," detailing the launch of "a new three-stone investment diamond product for limited sale beginning 3Q2014." The press release notes that "Secure$^D$ is an authorized global licensee of GemShares patented IP and proprietary GIGS Diamond technology." (DX-19.) Lipton described this press release as a draft, but whether it was or was not does not matter, since it asserts a fact that was manifestly not true. (*See* Tr. at 144:16-146:14.)

34.     Kinney did, in fact, believe that Lipton needed a license from GemShares to create his contemplated commercial product. (Tr. at 410:4-9, 420:19-21, 421:1-6, 421:9-13.) And Kinney had good reason for his belief. As a result of his talks with Feldman, Kinney was familiar with the GemShares patent. As described to the Court, the contemplated commercial product required the sorting of diamonds into separate groups of roughly equal value. (Tr. at 46:18-25, 409:20-410:7.) That is precisely what the process patented by GemShares did, and Kinney knew as much. (DX-1.) Indeed, the credible evidence suggests that Lipton had tried to interest Feldman in using the GemShares process to create a commercial product in addition to a financial product; and Kinney was introduced to Feldman because his ideas – for encasing diamonds in a resin "puck," for example – could be used to create both products. (*See* Tr. at 497:24-498:5, 501:6-502:4, 502:20-22.) As noted above, in December 2013, Lipton himself described his proposed new company to Feldman of GemShares as a "completely independent *licensed* commercial product company" (DX-26 (emphasis added)) – thereby admitting that a license was required for the venture.

35.     The credible evidence, therefore, establishes that Lipton intended to use GemShares' patented process to sort the diamonds into baskets, and then incorporate Kinney's technological ideas to create a finished product that could be sold. Lipton's testimony that he did not need a patent license because there would be no competition between his commercial product and GemShares' financial product (*see* Tr. at 537:18-538:10, 540:19-24) is utterly and completely incredible, as well as entirely at variance with patent law.

36.     There is an additional reason why Lipton needed GemShares' permission to proceed with his commercial venture. The GemShares LLC Agreement provided that members could not "engage in, acquire, or own any interest in, or assist any person who or which, directly

8

or indirectly through any other person, engages in any business, enterprise, trade, profession or employment that is competitive with [GemShares] and is related to any Gemstone Financial Product" – a term defined as "any product, service or business enterprise *that utilizes, in whole or in part, the Patent Interest of the Company*." (DX-2 (emphasis added).) "Gemstone Financial Products" were "created by securitizing, equitizing, and monetizing gemstones . . . into the exchange traded environment." (DX-2 at 7.) "[A]ny product, service or business enterprise that utilizes in whole or in part, the Patent Interest of [GemShares] . . . shall constitute a Gemstone Financial Product under the terms of this Agreement, including protection from unauthorized and unlicensed use and competition." (DX-2 at 7.) The proposed Secured Worldwide Vault meets the DX-2 definition of a Gemstone Financial Product. Therefore, Lipton could not produce it without obtaining the permission of his former partners, and Lipton's testimony to the contrary is utterly and completely incredible.[2]

37.     Nonetheless, Lipton decided to go ahead with his commercial venture (now named Secured Worldwide) without obtaining GemShares' consent.

38.     On October 22, 2014, a lawyer representing GemShares – Bob Rigg ("Rigg") of Vedder Price – sent Lipton a "shot across the bow" email, regarding the "recent conversations [Lipton] had with Vic Feldman regarding Secured Worldwide LLC." (DX-81.) Rigg noted that Lipton "mentioned to Vic that GemShares and Secured Worldwide LLC would work out a participation agreement" regarding "the commercial product concept from GemShares." (DX-81.)

39.     At this point, Lipton could no longer keep from Kinney the fact that he had a difference of opinion with GemShares about whether he needed Feldman's permission to manufacture and market the Vault. Lipton forwarded Rigg's email to Kinney on October 27, 2014, noting, "This is the background." (DX-81.) This represented the "very first time" that Kinney learned there was such a dispute and that Secured Worldwide held no license from GemShares. (Tr. at 445:24-446:3.) This email does not sound like it was being sent to someone who was already aware of the fact that Feldman and Lipton were in a dispute over Secured Worldwide's ability to manufacture and market its commercial product. To the extent that Lipton testified that Kinney was aware, prior to October 2014, of the fact that Secured Worldwide had no license from GemShares, I find his testimony entirely incredible and I reject it.

40.     I also reject the argument that Kinney could have obtained the information about a license directly from Feldman. Regardless of Feldman's assertion that Kinney was his "friend" (Tr. at 321:24-25) – a statement the Court interprets as meaning only that Feldman is not hostile to Kinney – the credible evidence supports Kinney's assertions that he met Feldman just once,

---

[2] There is no evidence in the record that Kinney was aware of the terms of the GemShares LLC Agreement at any relevant time prior to the commencement of this lawsuit. Therefore, it could not have affected his thinking on the matter one way or the other. Lipton knew about it, however, and I cite it as evidence that Lipton was lying when he testified that he did not need a license for his commercial product.

lived and worked 800 miles away from where Feldman lived and worked, and had no regular communication with Feldman on any subject. Kinney's contact with GemShares was Lipton, whom he had known for many years – not Feldman. (*See* Tr. at 49:9-11, 61:15-19.) If Lipton told him something about GemShares, Kinney would have had no reason to doubt it; similarly, Kinney had no reason to go behind Lipton's back, to a person he barely knew, in order to obtain assurances that information was not being kept from him by his long-time acquaintance. (*See* Tr. at 411:5-8.)

41.    Over time, Kinney reacted to Lipton's disclosure in two ways. At first, he was defensive: Kinney asserted that Rigg's characterization of the "commercial product concept from GemShares" was "problematic" and needed to be rebutted, because "[s]tatements that are not proactively challenged can be deemed to be accepted." (PX-34.) And when Lipton indicated a desire to litigate rather than conciliate, Kinney joined his aggressive posture, writing on November 4, 2014: "Overall, I don't think we should feel obligated to bend over backwards to any degree. Only if there is a mutually beneficial collaboration, could this be worthwhile. I don't believe any free equity is warranted or fair. They have not contributed value to us to deserve equity. Merely removing the risk of a lawsuit is just paying blackmail. . . . If they want to move towards the litigation path, that could be our next chess move – grabbing them by the balls and squeezing hard." (PX-36.)

42.    But Kinney also believed that GemShares actually had to license Secured Worldwide to use the algorithm that would sort the diamonds into roughly equivalent "baskets." Kinney sent the Secured Worldwide co-founders an email with an attached photo that outlined his proposals to resolve the dispute. (DX-83.) At a meeting with his partners, Kinney suggested asking GemShares to grant Secured Worldwide an exclusive license for retail and consumer applications with a proposed $5 million royalty payment. (Tr. at 446:20-23.) Next, he proposed that Secured Worldwide would license to GemShares the optimization software Secured Worldwide had created and later copyrighted. (Tr. at 446:24-25.) Kinney also suggested that Secured Worldwide should receive the rights to use the pricing that GemShares was displaying on NASDAQ. (Tr. at 447:3-5.) Kinney proposed cross-licensing all the intellectual property and GemShares' patent. (Tr. at 447:6-8.) Kinney proposed giving "GemShares an equity option for 5% of the company." (Tr. at 447:9-10.) Finally, Kinney proposed merging their collective data systems. (Tr. at 447:11-13.) As with so many things, he could not get Lipton to agree to any of his suggestions; but Kinney's suggestions are not the work of someone who believes no license is necessary.

43.    On December 1, 2014, Lipton received another "shot across the bow email," from John Sibrava ("Sibrava"), an attorney for GemShares. (DX-89.) In this formal complaint letter, Sibrava documented the "inherent conflict" that existed between Lipton and the remaining members of GemShares. (DX-89.) In this email, Sibrava observed that, "The concepts at the core of the Secured Global, LLC product are drawn from the work product generated by GemShares. Your planned launch and use of the product, even if independently developed, is clearly within the scope of the business of GemShares, which by your express agreement as a

10

member of GemShares, 'shall extend to and includes both Financial Trade and Commercial trade.' Clearly, the opportunity that presented itself to you is an opportunity to which GemShares is entitled. For those reasons, GemShares is also clearly entitled to participate, to a reasonable degree, in the revenue derived." (DX-89.)

### Lipton Finally Agrees to Employment Terms

44.    At about the same time, Kinney decided that he would not continue to work toward the rollout of Secured Worldwide's product without receiving cash compensation. Kinney demanded that he receive all his "future" compensation in cash, rather than stock. (Tr. at 449:8-18.) As usual, Lipton ignored him. Eventually, however, after Kinney said that he needed cash in order to pay for his children's private school tuition, Lipton agreed that Secured Worldwide would employ Kinney, effective November 1, 2014, on the basis that he would earn $200,000 per year ($7,692.31 in earnings and $5,195.19 after taxes/deductions on a bi-weekly basis), and that Kinney would be paid $75,000 – $25,000 immediately and $50,000 subsequently – to compensate him for the months of work he had already put into the project. (Tr. at 65:8-66:13, 250:22-25, 346:20-25, 449:13-14; PX-21; DX-96.)

45.    Kinney was not paid until the pay period beginning November 22, 2014, but thereafter and until he left Secured Worldwide on March 5, 2015, he received a check every other week for $5,195.19. Secured Worldwide also filed a W-2 for Kinney for 2014. (*See* PX-21; PX-22; Tr. at 345:12-346:19, 346:20-347:3.) His compensation is recorded on the books and records of Secured Worldwide.

46.    Kinney also received an immediate payment of $25,000 for previous work. (Tr. at 65:22-23, 451:21-22.) He was never paid the other $50,000 that he was promised. In an email dated January 30, 2015 – which responded to a request from Kinney for payment of the $50,000 – Scott Acker ("Acker"), Secured Worldwide's comptroller, told Kinney that Lipton "said not to pay the back pay yet. I can't pay it until he approves it. Please discuss it with him and have him send me an approval." Kinney forwarded this email to Lipton, asking him to approve it so he could "pay school deposits." Lipton replied by claiming that Secured Worldwide was "very short cash and [could not] take money from China. What is the minimum really?" Kinney responded by proposing "half, $35k," to which Lipton replied that Secured Worldwide did "not have it." (DX-96; Tr. at 451:12-452:8.) In those emails, Lipton did not deny having promised the money to Kinney; in fact, it sounds very much like he was trying to defer paying some or all of the amount. The Court credits Kinney's testimony that Lipton did promise a total of $75,000.

### Kinney Severs Relations with Lipton and Secured Worldwide

47.    Kinney and Lipton eventually came to blows over whether Secured Worldwide should produce both a high end and a lower priced ("utility") product – that is, both a Vult in which the diamonds were costly and of high quality and a Vult in which the diamonds were not costly and were of lesser quality – in order to appeal to different markets. (Tr. at 87:18-88:2.)

Lipton did not wish to go into the low-end market; Kinney did. (Tr. at 88:9-13.) Plourde thought Kinney's idea for a lower priced product was interesting, but advised that the company should not try to introduce products of two different values at the same time. (Tr. at 375:6-376:9.)

48.     Kinney finally decided to do exactly what Lipton had done to GemShares: threaten to go it alone in the hope of achieving a partnership on terms acceptable to him. He prepared a "Draft Term Sheet" on or about February 24, 2015, in which he documented the terms of a proposed "license agreement" between Secured Worldwide and FastFourier, the company that Kinney was intending to launch for the purpose of capturing the utility vult market. (PX-7; Tr. at 299:15-18.) Kinney claimed that he would not pursue his new business "without a license agreement." (Tr. at 299:19-22, 300:4-11.)

49.     After sending the "draft cooperation agreement," Kinney prepared a "summary" of his "legal position," which he presented to Moskowitz on or about February 23, 2015. (PX-19; Tr. at 292:8-11, 299:9-14.) Kinney prepared this document to "push the company to talk about a fair resolution . . . of the disagreement about whether [he] had actually worked for free an entire year and contributed all of [his] IP for free." (Tr. at 293:7-15.) In that document, Kinney asserted that "all intellectual property created by [him] before November 14, 2014, the earliest date of his compensation by Secured Worldwide LLC, is the exclusive property of Mr. Kinney." (PX-19.) "This includes those patent pending claims he invented, all technical product, platform and software designs, as well as the brand name 'vult,' which was coined and written by Mr. Kinney on June 30, 2014, gaining automatic copyright protection." (PX-19.) Kinney asserted that "any intellectual property [he] developed while employed, that is an extension to or based upon IP he developed prior to such timeframe, may not be used by Secured Worldwide, absent an agreement specifying the various rights and obligations of both parties." (PX-19.)

50.     On or about March 5, 2015, Kinney wrote a letter to the Secured Worldwide Board of Directors, claiming that Lipton "has forced the company to run as a dictatorship" and that Kinney had "launched a company that [would] use [his] IP to manufacture and sell a utility VULT." (PX-11.) Kinney wrote that he "offered SWW equity and a free cross license." (PX-11.) Kinney then emailed Joe Rousseau, Secured Worldwide's Marketing Director, informing him that he had "decided to use the vult name for the overall product category, including the new utility vult." (PX-12; Tr. at 315:13-21.) Kinney remarked that he was "simply making shared use a non-negotiable condition of whatever deal [was made] for the overall IP license." (PX-12.)

51.     Lipton refused to negotiate with Kinney.

52.     Kinney never returned to Secured Worldwide's offices after March 5, 2015.

53.     Between March 5 and March 10, 2015, Kinney, who was the webmaster for the Secured Worldwide web site, locked Secured Worldwide out of its own web page.

**The Litigation**

54.     On March 10, 2015, Secured Worldwide sued Kinney and sought a preliminary injunction against: (1) his competition with the company; (2) his use of the company's trademarks, copyrighted software, and trade secrets; and (3) his interference with the company's web site. (Dkt. #1.)  After a testimonial hearing, the Court granted the motion for a preliminary injunction on April 1, 2015. (Dkt. #35.)

55.     After the injunction was entered, Kinney asserted counterclaims against Secured Worldwide and Lipton for rescission of the LLC Agreement(s) and the patent assignment that accompanied them, on the ground that he had been fraudulently induced to enter into those agreements because Lipton led him to believe that Secured Worldwide was a licensee of GemShares. (Dkt. #60.)  Kinney also sought to enforce his employment agreement with Lipton.

**Kinney's Equity in Secured Worldwide is Revoked**

56.     The Amended and Restated LLC Agreement provided that Class A members "shall be deemed to have forfeited their respective Class A Membership Interests in full in the event they fail to pay the purchase price for such Class A Membership Interest pursuant to the terms of such purchase agreement." (PX-5, Section 4.7(a).)

57.     As noted above, Kinney had never made his capital contribution to the LLC as required by Schedule I. (*See supra* ¶ 8.)

58.     On October 12, 2015, Lipton caused a letter to be sent to Kinney, which said that "[a]fter numerous demands for payment over the past two (2) years and several extensions of time granted to you by the Company, you have still not made the Cash Capital Contribution to the Company.  By this letter, the Company makes a final demand for payment of the Cash Capital Contribution by 3:00 PM EDT on October 16, 2015 (the 'Final Payment Date').  If the Company has not received the Cash Capital Contribution from you in full by the Final Payment Date, the Company will cancel the CK Membership Interests, you will no longer own any Membership Interests or other interests in the Company and you will immediately cease to be a Member of the Company for all purposes." (PX-56.)  Secured Worldwide thereafter terminated Kinney's membership. (*See* Tr. at 94:21-95:8.)

**Subsequent Events**

59.     After Kinney left Secured Worldwide, it became apparent that the processes and products on which he was working did not work. (*See infra* ¶ 123.)  This caused Secured Worldwide to contract with persons not party to this lawsuit to create workable products and processes and delayed the launch of the product by "about a year . . . after Mr. Kinney left." (Tr. at 382:13-383:6.)

### _Conclusions of Law and Findings of Ultimate Fact Relevant Thereto_

**Claim for Fraudulent Inducement/Rescission (Kinney)**

60.     Rescission of a contract that was fraudulently induced is warranted when a party is induced to enter into the contract by: (1) an affirmative misrepresentation of material fact, on which the party reasonably relies, or (2) an omission to disclose a fact, or the concealment of a fact, which fact would have been material to a reasonable person contemplating entry into such contract, by one with a duty to disclose.  *See Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank*, 850 F. Supp. 1199, 1212 (S.D.N.Y. 1994); *Barrett v. Freifeld*, 908 N.Y.S.2d 736, 737-38 (2d Dep't 2010); *Sokolow, Dunaud, Mercadier & Carreras LLP v. Lacher*, 747 N.Y.S.2d 441, 446-47 (1st Dep't 2002).

61.     Lipton caused Kinney to believe that Secured Worldwide had a license from GemShares to manufacture and market the commercial product eventually known as "Vult." He affirmatively represented, in an email sent from him to Kinney, that NewCo (i.e., Secured Worldwide) would be a "licensed commercial product company" that would utilize the "GemShares patented process for fungibility" to create a commercial product that would be closely related to GemShares' financial product; he also represented that "the process to manufacture and support both commercial and financial products is almost identical." (DX-9.) He showed Kinney a draft of a press release designed for the "Secure[D] Worldwide" product launch; it, too, represented that Secured Worldwide "is an authorized global licensee of GemShares patented IP and proprietary GIGS® Diamond technology." (DX-19.)  But as early as December 2013 – just after Kinney joined forces with Lipton, but before the LLC Agreement and the patent assignment were signed – it became clear that GemShares had not yet licensed its patented technology to Secured Worldwide, and that there was no deal on the horizon for it to do so.  Nonetheless, Lipton deliberately did not divulge that information to Kinney.  He did, however, tell his other potential partners, Plourde and Lieberman, that he had turned down the terms on which GemShares had offered a license, and that GemShares had not agreed to any alternative proposal.

62.     Kinney reasonably believed that a license from GemShares would be required to create the commercial product that Secured Worldwide contemplated producing.  As admitted by Lipton in his email to Kinney, Secured Worldwide intended to use GemShares' patented process to create baskets of diamonds; that alone required a license from the patent holder, which was GemShares.  Indeed, it appears that Kinney was introduced to Feldman by Lipton in order to get GemShares interested in creating, *inter alia*, a commercial product using its patented process and Kinney's engineering ideas.  Lipton's testimony that no license would have been required is contradicted by his own contemporaneous statements and is entirely incredible.

63.     Therefore, the absence of a license from GemShares was a material fact, the concealment of which would have mattered to a reasonable person who was contemplating

14

joining a limited liability company and giving up his rights in intellectual property to that limited liability company.

64.    As one contemplating entering into a partnership with Kinney, Lipton had a duty to disclose the lack of a license to Kinney before Kinney signed the LLC Agreement and the patent assignment. *See Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat'l Ass'n*, 731 F.2d 112, 122-23 (2d Cir. 1984); *Swersky v. Dreyer & Traub*, 643 N.Y.S.2d 33, 37 (1st Dep't 1996).

65.    Kinney has proven by clear and convincing evidence that he was fraudulently induced (1) to enter into the LLC Agreement and (2) at or about the same time, to assign his interest in the invention that is the subject of U.S. Patent Application "US 2015/0223580 A1," and his interest in any patent that might issue thereon. (*See* DX-108.)

66.    Kinney has elected rescission as his remedy of choice.  Therefore, to the extent of his membership, the LLC Agreement (PX-5) is deemed rescinded; and to the extent of his assignment, the patent assignment (PX-16) is deemed rescinded.

67.    The rescission of the contracts makes them void *ab initio* as to Kinney, and restores to him his ownership of the claimed invention and his interest in any patent that might issue thereon. *See Schwartz v. Nat'l Computer Corp.*, 345 N.Y.S.2d 579, 582 (1st Dep't 1973) ("It should be pointed out that to grant rescission is to declare the contract void from its inception and to put or restore the parties to status quo."). However, Kinney is correct that there is no way to "unscramble the eggs" entirely in this case. He worked for a year and more for modest compensation on the understanding that he was to be a partner in a joint venture, and in the expectation of a financial reward if the Vult were successful in the marketplace.  And while much of the work he did appears to have been fruitless and needed to be redone (*see supra* ¶ 59), there is no way to assess how much (or how little) of his effort is reflected in the processes on which he worked during that year -- put otherwise, how much his effort has resulted in the unjust enrichment of his partners and their investors.

68.    The law of the State of New York permits a court to "otherwise in its judgment so adjust the equities between the parties that unjust enrichment is avoided."  CPLR § 3004; *11 S. Laundry, Inc. v. MCD Assets, LLC*, 39 Misc. 3d 1218(A) (Sup. Ct. Westchester Cty. 2013).  I conclude that it would be appropriate for the Court to enter such an award in this case to avoid any unjust enrichment to Secured Worldwide as a result of any use it may be making.

69.    That said, I reject Kinney's assertion that he is entitled to somewhere between $4 million and $8 million, which is his estimate of what the value of his interest in Secured Worldwide would be today. (*See* Tr. at 661:22-24.)  Because he elected rescission, Kinney is not entitled to what he is in essence seeking -- the benefit of the bargain he rescinded, measured by what he believes is the current value of his interest in Secured Worldwide.

70.     Even if Kinney were equitably entitled to an award measured by what the value of his interest in the company would have been, there is no basis on which the Court could enter such an award, because there is no competent evidence of what that number would be. Kinney did not have a valuation expert testify as to the current valuation of Secured Worldwide, and his resume does not suggest that he has the training or experience to offer such analysis. Kinney merely testified that the current value of the company was the value that was invested in the company (see Tr. at 439:15-440:19) and presented a term sheet (DX-43), which indicated that Secured Worldwide hoped to raise $5 million on top of the "pre-financing" $500,000 invested by Lipton, Lieberman, Plourde, Kinney, and an individual named Damon Davis. Kinney believes that his intellectual property is the reason that the company would have been able to raise such sums of money; indeed, he testified that, solely as a result of his contribution of his intellectual property to the venture, the "valuation" of the company jumped from $500,000 to $5 million to $50 million. (See Tr. at 439:15-23, 469:9-470:1.) He offered no competent evidence to support that assertion.

71.     In any event, there is no evidence in the record to show that Secured Worldwide actually raised this sum, or anything like it. The only evidence that any additional amount was invested beyond that disclosed in Schedule I to PX-5 (the Amended and Restated LLC Agreement signed in or about July 2014) is Lipton's testimony that he put an additional sum of $1.2 million into the company. (Tr. at 53:10-13.) That sum is well under the $5 million that the company hoped to raise per the term sheet. Lipton also testified that Secured Worldwide had "two [undisclosed] investors in 2015" (Tr. at 542:20), but neither party elicited the amount that these investors put into the company.

72.     Furthermore, investment by outsiders – even outsiders who were given Class B rather than Class A stock (as SDC Designs, LLC was) – would inevitably dilute the interest of the original investors in Secured Worldwide. But there is no evidence in the record that demonstrates how much dilution was caused by outside investment, and Kinney's testimony does not take dilution into account.

73.     Finally, the company is now a going concern that is selling product (which was not the case when Kinney left). So the notion that its "valuation" would be equal to the amount invested is no longer accurate, if it ever was. There is no hard evidence of Secured Worldwide's worth today; Lipton estimated Secured Worldwide's going-concern valuation at "[s]omewhere between one and three times revenues," amounting to "[s]omewhere between" $3 million and $10 million. (Tr. at 543:9-19.) If the total valuation of the company is $3 million (which is more or less equivalent to the amount that the Court knows to have been invested in the venture in total), then Kinney is seeking more than the total valuation for himself. There is nothing equitable about that.

74.     Kinney himself has taken the position that the contribution of his intellectual property to Secured Worldwide was supposed to satisfy his obligation to contribute capital to the LLC. While Schedule I of the LLC Agreement, which sets out the capital contributions to be

16

made by the original investors, does not support his position concerning "in kind" capital contributions, Kinney's testimony suggests that, at the time the contracts were signed, he personally valued his intellectual property at what it would have taken to obtain a 12.25% interest in Secured Worldwide – which is to say, $61,250. (*See* Tr. at 423:18-20.) In view of the fact that his intellectual property had to be reworked by others in order to make it functional, that number seems to the Court to be an equitable estimate of the amount by which Secured Worldwide was enriched by virtue of the contribution of Kinney's intellectual property. Of course, Kinney continued to work on developing the intellectual property that he brought into the company after he joined Secured Worldwide, but he did so at the company's expense (*see* Tr. at 75:17-76:8, 82:9-15, 381:3-384:23, 432:19-24, 444:1-9; PX-3), and ultimately pursuant to an employment contract (*see infra* ¶ 77) – both of which militate against a finding that the company was "unjustly enriched" by using anything Kinney developed during his formal association with Secured Worldwide. I therefore award Kinney $61,250, to prevent unjust enrichment to Secured Worldwide for whatever use it may have made or be making of the intellectual property that he brought to the company.

75.     As will be seen below, Kinney agreed to accept $75,000 in back pay for the work he performed during his first 11-12 months at Secured Worldwide. I will, therefore, not grant Kinney any award in equity to compensate him for that work. I will instead enforce what I find to be his contract.

**Claim for Breach of Employment Contract (Kinney)**

76.     Kinney did not have an employment contract with Secured Worldwide prior to November 2014. There is no credible evidence that there was any meeting of the minds between Kinney and Lipton concerning all the material terms of his employment by Secured Worldwide. The credible evidence is that, until November 2014, Kinney repeatedly proposed employment terms that were either rejected or ignored by Lipton.

77.     The terms of Kinney's employment contract with Secured Worldwide as reached in early November 2014 were as follows: effective November 1, 2014, he was employed at a salary of $200,000 per annum, payable every two weeks, and he was entitled to back pay of $75,000 to compensate him for services rendered prior to November 1, 2014. (*See* DX-96.)

78.     Kinney received only $25,000 of the $75,000 that Lipton promised to pay him for services rendered prior to November 1, 2014.

79.     Kinney was paid beginning with the pay period that started November 22, 2014, which means he was not paid for one and one-half pay periods earlier in November.

80.     Kinney was paid for all the time that he worked between November 22, 2014 and March 5, 2015, which is when he left Secured Worldwide and abandoned his employment of his own free will. (*See* Tr. at 345:12-346:19, 346:20-347:3.)

81.     Secured Worldwide has breached Kinney's contract of employment.

82.     The amount owed for those three weeks is as follows: $3,846.16 for the period November 1-7, 2014, together with prejudgment interest at the New York rate of 9%; and $7,692.31 for the period November 8-21, 2014, together with prejudgment interest at the New York rate of 9%. The Court's award of damages for the breach is not net of taxes, but because it is in the nature of back pay, Kinney will ultimately owe taxes on it. *See Noel v. N.Y. State Office of Mental Health Cent. N.Y. Psychiatric Ctr.*, 697 F.3d 209, 213 (2d Cir. 2012); *Guzman v. Prodelca Corp.*, No. 16 Civ. 2637, 2016 WL 4371631, at *1 (S.D.N.Y. Aug. 16, 2016).

83.     Kinney is also owed $50,000, together with prejudgment interest at the New York rate of 9% from January 1, 2015, the date by which the Court finds the $50,000 in additional back pay should have been paid to Kinney. Again, these are pre-tax numbers; Kinney should consult with a tax adviser about the tax implications of this damages award.

**Trademark Claim (Secured Worldwide)**

84.     Secured Worldwide seeks a declaration that it is the owner of the trademark "Vult" and variations thereof.

85.     Secured Worldwide has registered the trademark "Vult" and variations thereof with the U.S. Patent and Trademark Office, which has assigned them the number 4,956,745. (Tr. at 222:19-223:9, 349:24-350:3; PX-18.)

86.     Secured Worldwide was the first to use the trademark Vult and variations thereof in commerce. (Tr. at 76:9-15.)

87.     The credible evidence in this lawsuit indicates that Secured Worldwide hired an outside consulting/branding firm to help it coin its trademark. (Tr. at 75:17-76:8.)

88.     The trademark was devised at a group meeting involving representatives of Secured Worldwide, including Lipton and Kinney, and representatives of the outside firm. (Tr. at 75:15-76:8, 76:12-13, 347:4-12, 347:19-348:7, 348:20-22, 349:8-12.)

89.     Secured Worldwide, not Kinney, owns the trademark Vult and variations thereof.

90.     There is no basis, either in law or in equity, to conclude that Kinney is or ought to be deemed to own the trademark Vult. "The common law and the Lanham Act require that trademark ownership be accorded to the first bona fide *user*." *Hydro-Dynamics, Inc. v. George Putnam & Co., Inc.*, 811 F.2d 1470, 1472 (Fed. Cir. 1987) (emphasis added). "A protectable trademark is established when the mark is adopted and used to identify a product." *C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc.*, 753 F.2d 14, 16 (2d Cir. 1985). "A certificate of registration with the PTO is prima facie evidence that the mark is registered and valid (*i.e.*,

protectable), that the registrant owns the mark, and that the registrant has the exclusive right to use the mark in commerce." *Guthrie Healthcare Sys. v. ContextMedia, Inc.*, 826 F.3d 27, 37 (2d Cir. 2016).

91.     Any contribution that Kinney made to the endeavor to find a trademark for the Secured Worldwide product should be attributed to Secured Worldwide. (*See* Tr. at 220:2-9, 348:10-350:11; DX-68.) "Mere invention, creation, or *discussion* of a trademark does not create priority rights." *Hydro-Dynamics, Inc.*, 811 F.2d at 1473 (emphasis added). "The mere fact that a party conceived the idea of a trademark and discussed it with others does not establish priority as of the date of those events." 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 16:12 (4th ed. 1997); *see also Compton v. Fifth Ave. Ass'n, Inc.*, 7 F. Supp. 2d 1328, 1331 (M.D. Fla. 1998). "The user who first appropriates the mark obtains [an] enforceable right to exclude others from using it, as long as the initial appropriation and use are accompanied by an intention to continue exploiting the mark commercially." *George Nelson Found. v. Modernica, Inc.*, 12 F. Supp. 3d 635, 645 (S.D.N.Y. 2014).

92.     Kinney is hereby enjoined from making any use in commerce of Secured Worldwide's registered trademark 4,956,745.

**Copyright Claim (Secured Worldwide)**

93.     Secured Worldwide registered certain computer software entitled "Alkis Diamond-Model Utility" with the U.S. Register of Copyrights, TXu001928825. (PX-27; Tr. at 224:7-227:3, 352:7-9.) The software is used "in terms of a system whereby [Secured Worldwide] select[s] diamonds from the universe of diamonds to create the individual collections that are then enclosed in the individual products." (Tr. at 81:16-82:17.)

94.     The registration is presumptive proof of Secured Worldwide's ownership of the copyright in the registered software. "A certificate of copyright registration constitute[s] prima facie evidence of the validity of the copyright and of the facts stated in the certificate, and, [o]rdinarily, a copyright registration is presumed valid." *Palmer/Kane LLC v. Rosen Book Works LLC*, 15 Civ. 7406, 2016 WL 4534896, at *3 (S.D.N.Y. Aug. 30, 2016).

95.     The registered software was created by a computer programmer named Alkis Vazacopoulos, who was associated with a company called Industrial Algorithms. (Tr. at 82:3-17, 437:12-20; PX-3.)

96.     Secured Worldwide retained Industrial Algorithms to write software that would permit it to assemble equal "baskets" of diamonds to be included in its products at various price points. (Tr. at 82:8-15, 350:12-22; PX-3.)

97.     Industrial Algorithms signed a contract with Secured Worldwide that required it to acknowledge that the "deliverables" were works for hire owned by Secured Worldwide.  (Tr. at 83:8-15, 350:20-22; PX-3 at 4.)

98.     The copyrighted software is the "deliverable" that was created by Industrial Algorithms.

99.     The copyrighted software puts expression to an idea or ideas that were generated, in whole or in part, by Kinney.  (Tr. at 437:14-439:14; DX-65.)

100.     Kinney himself admitted during the trial that he required the services of a more expert programmer than himself to create workable software to use in connection with the assembly of Secured Worldwide's Vult products.  (*See* Tr. at 415:14-25, 439:8-14.)

101.     Copyright does not protect ideas.  Rather, it protects expressions of ideas that are fixed in a tangible medium.  *Mattel, Inc. v. Goldberger Doll Mfg. Co.*, 365 F.3d 133, 135 (2d Cir. 2004); *McDonald v. West*, 138 F. Supp. 3d 448, 455 (S.D.N.Y. 2015).

102.     The expression of ideas fixed in a tangible medium – which is to say, the property that was registered for federal copyright protection by Secured Worldwide – is the computer program that was created by Industrial Algorithms, not some outline of ideas created by Kinney.  (PX-3; PX-27; Tr. at 224:20-225:19.)

103.     Secured Worldwide, not Kinney, owns the copyrighted computer program software.  (PX-3.)

104.     Kinney is hereby enjoined from making any use of the copyrighted program.

105.     To the extent that Kinney seeks copyright protection for the word "Vult" – because he allegedly uttered the word and wrote it down (*see supra* ¶ 49) – his claim fails, because the word "Vult" is not copyrightable.  "It is axiomatic that copyright law denies protection to 'fragmentary words and phrases' and to 'forms of expression dictated solely at functional considerations' on the grounds that these materials do not exhibit the minimal level of creativity necessary to warrant copyright protection."  *CMM Cable Rep, Inc. v. Ocean Coast Props., Inc.*, 97 F.3d 1504, 1519 (1st Cir. 1996); *see also Arica Inst., Inc. v. Palmer*, 970 F.2d 1067, 1072 (2d Cir. 1992) ("[S]ingle words or short phrases . . . do not exhibit the minimal creativity required for copyright protection."); *N.Y. Mercantile Exch., Inc. v. IntercontinentalExchange, Inc.*, 389 F. Supp. 2d 527, 544 (S.D.N.Y. 2005).  "The Copyright Office's own interpretive regulations explicitly embrace this rule of non-copyrightability." *CMM Cable*, 97 F.3d at 1520; *see also* 37 C.F.R. § 202.1(a) (1994) (excluding from copyright protection "[w]ords and short phrases such as names, titles, and slogans" and "familiar symbols and designs").

**Web Site Claim (Secured Worldwide)**

106.     Secured Worldwide maintained and maintains a web site and ownership of
several domain names relating to its trademarked Vult product: www.vult.com,
www.securedworldwide.com, and www.vult.net.  (Tr. at 93:10-24.)

107.     During his tenure with Secured Worldwide, Kinney was in charge of the web site
as its webmaster; he helped develop it and he was the only person at Secured Worldwide who
was able to fully access it.  He also caused the domain names to be registered with GoDaddy, a
well-known domain registrar.  (Tr. at 93:14-24, 178:7-23, 319:21-320:16, 320:25-321:4.)

108.     Kinney's control over the Secured Worldwide web site and his registration of the
domain names was done on behalf of and as an agent for Secured Worldwide, not for himself
individually.

109.     In early March 2015, while engaged in a dispute with Lipton and Secured
Worldwide, Kinney effectively locked Secured Worldwide out of its own web site.  (Tr. at 93:9-
94:2.)

110.     On April 1, 2015, this Court issued a preliminary injunction directing Kinney to
give control over the web site to Secured Worldwide.  (Dkt. #35.)

111.     Although Secured Worldwide has regained day-to-day control of the web site
since this Court enjoined Kinney from interfering with that control, the domain registrar
GoDaddy, from whom the domain names were purchased, will not delete Kinney as an owner of
the web site absent a court order settling the ownership of the domain names and the web site.
(Tr. at 94:12-20.)

112.     Secured Worldwide is the sole owner of the three domain names listed above and
is the only proper controller of the web site. The fact that Kinney was the agent of Secured
Worldwide who created the web site and registered the domain names does not make him the
owner of the web site or the domain names as against Secured Worldwide.

113.     Kinney is hereby enjoined from asserting that he owns any of the above-listed
domain names or from asserting ownership or control over any web site using those domain
names, whether previously or hereinafter created and regardless of his role in creating them.

**Patent Claim (Secured Worldwide)**

114.     Secured Worldwide has filed a provisional and a final application with the U.S.
Patent and Trademark Office for the issuance of a patent for "SECURE DIAMOND SMART
CARDS AND EXCHANGE SYSTEMS THEREFOR."  (DX-108; PX-13; PX-14; PX-15; PX-
16; Tr. at 201:13-210:15.)

115.    Listed as inventors on the application are Kinney, Lipton, and Plourde.  (DX-108; PX-13; PX-16; Tr. at 199:4-14, 200:13-201:11.)

116.    No patent has as yet issued.  (Tr. at 81:9-10.)

117.    Kinney was the principal contributor of technology to the invention; Lipton had the idea for the invention; Plourde created an "ecosystem" for the product's aftermarket and drew some of the concepts pertaining to the diagrams in the patent.  (Tr. at 378:11-18, 378:19-25, 379:1-23.)

118.    Moskowitz, an experienced patent lawyer, determined, after listening to presentations from the principals of Secured Worldwide, who should be listed as inventors on the patent.  Secured Worldwide followed Moskowitz's advice in this regard.  (Tr. at 200:13-201:11.)

119.    All three inventors signed patent assignments assigning their interests in the invention and any patent that might issue thereon to Secured Worldwide.  (PX-15; PX-16; Tr. at 210:16-216:11.)

120.    35 U.S.C. § 262 sets forth the rights of joint owners of a patent: "In the absence of any agreement to the contrary, each of the joint owners of a patent may make, use, offer to sell, or sell the patented invention within the United States, or import the patented invention into the United States, without the consent of and without accounting to the other owners."  *See also Advanced Video Techs., LLC v. HTC Corp.*, 103 F. Supp. 3d 409, 417 (S.D.N.Y. 2015).  "[I]n the context of joint inventorship, each co-inventor presumptively owns a pro rata undivided interest in the entire patent, no matter what their respective contributions."  *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1465 (Fed. Cir. 1998).  "Each co-owner of a United States patent is ordinarily free to make, use, offer to sell, and sell the patented invention without regard to the wishes of any other co-owner. Each co-owner's ownership rights carry with them the right to license others, a right that also does not require the consent of any other co-owner. . . . [T]he co-owner may not be prohibited from exploiting its rights in the patent, including the right to grant licenses to third parties on whatever conditions the co-owner chooses."  *Schering Corp. v. Roussel-UCLAF SA*, 104 F.3d 341, 344 (Fed. Cir. 1997) (internal citations omitted); *see also Canon Inc. v. Tesseron Ltd.*, 146 F. Supp. 3d 568, 575 (S.D.N.Y. 2015).

121.    Because Kinney's assignment has been rescinded, he and Secured Worldwide (by assignment from Lipton and Plourde) are co-owners of the invention described in the patent application "US 2015/0223580 A1," and each of Kinney and Secured Worldwide has all of the rights set forth in 35 U.S.C. § 262.  (*See* DX-108.)

**Trade Secrets Claim (Secured Worldwide)**

122.    Secured Worldwide is not entitled to a permanent injunction barring Kinney from using the trade secrets he was developing to make the company's invention commercially viable,

22

because it has not demonstrated that Kinney has access to any trade secrets of Secured
Worldwide.

123.    From the testimony at the trial, it does not appear that Secured Worldwide is
presently using any trade secrets that Kinney worked on during his time with Secured
Worldwide.  It appears from the evidence that there were two such "trade secrets" in addition to
the copyrighted computer program discussed above: the resin that Kinney was developing, at
Secured Worldwide's expense, to create the "puck" in which the diamond baskets would be
encased; and some unspecified aspects of the technology that was to be used to make the cell
phone "authentication" feature work.  However, the credible evidence establishes that the resin
ultimately proved unsatisfactory, and the authentication feature as developed by Kinney did not
work.  The company had to hire and pay others to re-work these technologies in order to make
the claimed invention commercially viable after Kinney left the company, and had to
substantially delay the launch of the product in order to develop these new processes.  (*See* Tr. at
72:18-75:13, 381:21-384:1.)

124.    There is no evidence that Kinney has any access to the new processes that were
developed by Secured Worldwide after he left.  Therefore, there is no basis for the Court to
conclude that Kinney would be in a position to use these "trade secrets."  There is also no
evidence in the record that Kinney has access to any other sort of trade secret, such as Secured
Worldwide's current customer lists.  "Forward-looking injunctive relief of this sort is not
available absent plausible allegations that a plaintiff faces 'a likelihood of substantial and
immediate irreparable injury' because of a real or immediate threat the plaintiff will suffer an
injury again.  While evidence of past injury may bear on the likelihood of future injury, it does
not establish it on its own."  *See Silberstein v. Aetna, Inc.*, No. 13 Civ. 8759, 2015 WL 1424058,
at *16 (S.D.N.Y. Mar. 26, 2015) (internal citations omitted).

125.    The preliminary injunction barring Kinney from using Secured Worldwide's trade
secrets is hereby dissolved, subject, however, to the limited permanent injunction that the Court
is entering in Plaintiff's favor.

**Non-Competition Agreement (Secured Worldwide)**

126.    Secured Worldwide is not entitled to a permanent injunction enforcing the non-
competition agreement in the LLC Agreement, because the LLC Agreement has been rescinded.

127.    The preliminary injunction barring Kinney from entering into any business that
competes with Secured Worldwide's business is hereby dissolved, subject, however, to the
limited permanent injunction that the Court is awarding in Plaintiff's favor.

WHEREFORE, the parties shall have judgment as follows:

1. Plaintiff Secured Worldwide shall have judgment against Defendant Kinney as follows:

   (i) Declaring that Plaintiff is entitled to the rights in the registered trademark Vult® and its variations, and enjoining Defendant from using the registered trademark Vult®, its variations, and/or any mark that is confusingly similar to the registered trademark Vult®;

   (ii) Declaring that Plaintiff is entitled to the rights in the software reflected in Plaintiff's copyright registration and enjoining Defendant from infringing on Plaintiff's copyright, TXu001928825;

   (iii) Declaring that Plaintiff is the sole owner of and entitled to the domain names www.vult.com, www.securedworldwide.com, www.vult.net, and their variations, which remain registered to Cormac Kinney on the records of GoDaddy, the domain name registrar; and

   (iv) Enjoining Defendant from interfering with the use, dominion and control over Plaintiff's web site(s) and domain name(s), or from interfering with the transfer of ownership of domain names to Secured Worldwide by GoDaddy.

2. Defendant-Counterclaim Plaintiff Kinney shall have judgment against Plaintiff-Counterclaim Defendant Secured Worldwide as follows:

   (i) In the amount of $3,846.16, with interest at the rate of 9% from November 2, 2014 until the date of entry of this judgment; and

   (ii) In the amount of $7,692.31, with interest at the rate of 9% from November 9, 2014 until the date of entry of this judgment; and

   (iii) In the amount of $50,000, with interest at the rate of 9% from January 1, 2015 until the date of entry of this judgment; and

   (iv) In the amount of $61,250, which shall be an award in equity to prevent unjust enrichment to Plaintiff upon rescission of the contracts in suit.

The total award of damages and equitable monetary relief shall bear interest at the Fed Funds Rate from the date of entry of the judgment until the date the judgment is satisfied.

3. Third-Party Defendant A. Joseph Lipton shall have judgment dismissing all claims as against him personally.

4.  All other claims and counterclaims/third party claims asserted by any party against any other party are hereby DISMISSED WITH PREJUDICE.

The Clerk of the Court shall enter judgment accordingly, and close the file.


Dated: December 15, 2016

_____
Chief Judge


BY ECF TO COUNSEL FOR SECURED WORLDWIDE/LIPTON
BY FIRST CLASS MAIL TO MR. KINNEY

# EXHIBIT 4



750 Lexington Avenue
New York, NY 10022
Telephone: 212-308-4411
Fax: 212-308-4844
www.lockelord.com


Zachary W. Silverman
Associate
Direct Telephone: 212-912-2759
Direct Fax: 866-955-9376
zachary.silverman@lockelord.com

March 13, 2015

<u>Via ECF</u>

Hon. Colleen McMahon
United States District Court
Southern District of New York
500 Pearl Street, Room 1640
New York, New York 10007

      Re:    <u>Secured Worldwide, LLC v. Kinney</u>, 15-cv-1761 (CM)

Dear Judge McMahon:

In light of the upcoming document exchange in connection with plaintiff Secured Worldwide, LLC's application for a preliminary injunction, the parties have agreed to the enclosed stipulation and confidentiality order, which incorporates your Individual Practice Rule IV.I. We respectfully request that this Court so-order it.

Respectfully submitted,

Zachary W. Silverman

Enclosure

AM 46061647.2

Atlanta | Austin  | Boston | Chicago | Dallas | Hartford | Hong Kong | Houston | Istanbul | London | Los Angeles | Miami | Morristown | New Orleans
New York | Orange County | Providence | Sacramento | San Francisco | Stamford | Tokyo | Washington DC | West Palm Beach

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- x
                    :

SECURED WORLDWIDE, LLC,      :

                    :  No. 15 Civ. 1761 (CM)

          Plaintiff,    :

   -versus-            :

CORMAC KINNEY,            :

                    :

         Defendant.   :

                    :
------------------------------------- x

## STIPULATION AND CONFIDENTIALITY ORDER

The parties, by their counsel, hereby stipulate and agree that in connection with this litigation, if there is an occasion to disclose information deemed by any party to constitute confidential or proprietary information, the following procedures shall be employed and the following restrictions shall govern:

1.     For purposes of this stipulation and order, confidential information shall mean information within the knowledge or possession of any party that the party asserting the confidentiality thereof reasonably believes to be protectable as confidential information or as trade secret.  Any testimony, information, and documents or things, including without limitation, interrogatories, answers to interrogatories, depositions, and answers to admissions, which any party believes contains confidential information (hereinafter "Protectable Information"), shall be marked or otherwise designated as "CONFIDENTIAL." However, the parties shall not mark as "CONFIDENTIAL" any document whose confidentiality is not reasonably necessary for bona fide business or privacy reasons.

2.     All Protectable Information which is to be filed with the United States District Court and which contains, reproduces, incorporates or paraphrases anything marked or

designated "CONFIDENTIAL" shall be filed in sealed envelopes or other appropriately sealed

containers on which shall be endorsed the caption of this proceeding, indication of the nature of

the contents of such envelope or container, the words "CONFIDENTIAL" and a statement to the

effect that "This envelope contains confidential and proprietary information and is neither to be

opened nor the contents thereof displayed or revealed to anyone except pursuant to an order of

the Court or by consent of the parties."

      3.      Each party may designate, by marking "CONFIDENTIAL" any Protectable

Information which, in the good faith and judgment of such party, contains trade secrets or

confidential or proprietary research, development, marketing, commercial or financial

information, including but not limited to information regarding intellectual property, trade

secrets, customers or clients, their financial status or activities. If the producing party designates

discovery material as "CONFIDENTIAL" after copies thereof have been delivered to the

receiving party, the delivered copies thereafter shall be treated in accordance with such

designation.

      4.      Information disclosed at a deposition may be designated as "CONFIDENTIAL"

by indicating on the record at the deposition that the testimony is confidential subject to the

provision of this order. A party may also designate information disclosed at such a deposition as

confidential by notifying all parties in writing within ten days of receipt of the transcript of the

specific pages and lines of the transcript, or the specific exhibits which are confidential. Each

party shall attach a copy of such written statement to the face of the transcript and each copy

thereof in his possession, custody or control. The entire content of any deposition transcript shall

be treated as "CONFIDENTIAL" for a period of ten days after a full and complete transcript of

said deposition is available.